EUGENIA C. CLARK *et al.*, plaintiffs in error, *vs.* JERRY BEALL, defendant in error.

39 533
e117 379

Whilst it is the settled rule that bills in equity must be brought in a county where one of the defendants, against whom substantial relief is prayed, resides, this rule does not apply to bills for injunction, etc., ancillary to suits at law. In such cases, the Court of Equity of the county where the suit is pending, has jurisdiction to enjoin the suit at law, and also to grant relief, as to all matters involved in a proper settlement of the litigation pending at law.

When B., C. and D. were sued, at law, by A., who resided in a different county from that in which the suit was brought, and the defendants at law filed a bill, charging that the suit at law was for the recovery of the purchase-money of a tract of land lying in the same county, which land had been sold to the defendants at law and complainants in the bill by A.; and the bill further charged, that at the time of the sale, the land was not in truth the property of A., but had, before that time, become in equity, the property of E., the deceased son of A., and husband of B., under a parol agreement, which was partly performed, which equitable title had been *fraudulently concealed* from the wife by A., at and before the sale of the land to her and the other complainants ; and the bill further charged that the land had been paid for under the parol agreement by E., with certain cotton made on the place, which went into A's hands, and by certain trust funds in his, A's, hands, belonging to E : *Held*, that the Superior Court of the county where the suit was pending had *jurisdiction*. 1st. To enjoin the suit at law. 2d. To cancel the notes and deed made at the second sale. 3d. To decree a specific performance of the parol agreement, and a full settlement between the parties as to all matters connected with the land and the cotton made thereon. *Held, further*, that while said Court had no jurisdiction to decree an account between A. and

the heirs of D., as to trusts not connected with the land, yet it might inquire how far the trust funds had been used in the performance of the parol agreement, and if the case made required it, so apply them to the extent shown by the proof, leaving a full and final *account* as to said trusts to the Court having jurisdiction of the defendant's person.

Where A. sells a tract of land to B., C. and D., taking their notes and a mortgage on the premises for the purchase-money, and the vendees afterwards sell to F., also taking notes and a mortgage, which notes and mortgage they place in A's hands as collateral security for their own debt for the land to him, with power to A. to collect and settle with F., and A. takes the land from F., who is insolvent, and gives up the notes and mortgage made by F. at a price less than the amount of the notes, and this without the *consent* of the original vendees from him. *Held*: that A. can take no benefit to himself from this arrangement with F., and he is bound to credit his vendees with the true value of the land, or return it to them.

When a bill is objectionable for want of proper parties, but the point does not appear to have been adjudicated by the Court below, this Court will not pass judgment upon it, the presumption being that if the point had been made, the Court below would have permitted, or required the proper parties to be made.

When, as in this case, the injunction to stay proceedings at law, is the principal object of the bill, and a temporary injunction has been granted, the Court ought not to dissolve the injunction, and permit the case at law to proceed, unless it clearly appear from the evidence before it, that there is no case, proper, to be submitted to a jury for a decree.

Equity jurisdiction, etc. Decided by Judge JAMES M. CLARK. Dougherty county. Chambers. April, 1869.

Jerry Beall, of Baldwin county, Georgia, sued Eugenia C. Beall, Julia A. McLaren, Peter McLaren, and Mathew L. Bryan, in Dougherty Superior Court, on two promissory notes made by them to him, for $20,000 00 each, each dated the 23d of January, 1866, and due on the 1st of January, 1867 and 1868, respectively. These defendants, pending this action, filed against Jerry Beall, in Dougherty county, a bill to enjoin this suit, and for account of certain trust funds, etc. The injunction was granted. Jesse Beall, a minor, by his guardian, *ad litem*, was made a party complainant. Jerry Beall, by his solicitor, demurred to said bill upon the ground that the Chancellor in Dougherty county was without jurisdiction in the premises, because of multifariousness, for want

Clark *et al.*, *vs.* Beall.

of equity, uncertainty, etc. At the same time he filed an answer and moved to dissolve said injunction. The demurrer and motion were, by consent, considered together. Besides the voluminous pleadings, very many affidavits were read. For the substance of so much of said matter as is important for an understanding of the cause, see the opinion of the Court. By marriage *ad interim* Eugenia C. Beall became Eugenia C. Clark. The Court sustained the objection to his jurisdiction as to the Sanford and Moughon property, because it was independent of the contract concerning the land for which these notes were given, and dissolved the injunction except as to one of said notes.

That action of the Court is assigned as error.

VASON & DAVIS, HAWKINS & BURKE, WRIGHT & WARREN, for plaintiffs in error.

B. H. HILL, for defendant in error, cited *Carswell vs. The Macon Manufacturing Company*, 38th Ga. R., as to jurisdiction.

McCAY, J.

This bill was filed by the complainants, in Dougherty county, to enjoin a suit pending at law in that county against them, in favor of Jerry Beall, who resides in Baldwin county. The bill also prayed certain other relief, as will appear from the following statement of its charges and objects:

The bill charges that the notes on which the suit is founded were given by complainants to the defendant for a plantation in Dougherty county, some time in 1866; that they amounted altogether to $60,000 00; that they had subsequently sold the plantation to one Woodward, taken his notes and a mortgage for $60,000 00, and turned them over as collateral security to Jerry Beall; that Jerry Beall had made some arrangement with Woodward's heirs, and had now himself possession of the premises, claiming it as his own, not fairly accounting to them, complainants.

The bill further charged that Eugenia Beall, one of the

complainants, now Mrs. Clark, was the widow of Jesse Beall, the son of Jerry Beall, and that said land so purchased by her and the other complainants, from Jerry Beall, was in fact the property equitably of her deceased husband, Jesse Beall, at the time of the sale of the same by Jerry Beall to them, though neither she nor they were, at the sale, aware of the fact, but that since that sale it had come to their knowledge; that in 1860, previously to Eugenia's marriage with Jesse, he, Jesse, had been put by his father, the defendant, in possession of that portion of the premises known as the Wilkins place, under an agreement between them, that when he paid a certain amount, to the complainants unknown, the said land, was to be his, and that the other portion of said land, known as the Echols place, was subsequently purchased by said Jerry and contracted to the said Jesse by him on the same terms.

The bill further charged, that Jesse Beall, before his death, had made a large number of bales of cotton, which, since his death, Jerry Beall had taken possession of and sold, and that he had realized therefor ......... dollars, or other large sum. The bill also charged, that in 1860, and at the death of Jesse Beall, there was in the hands of Jerry Beall two trust funds belonging to said Jesse, amounting to ......... dollars, or other large sum, which, with the proceeds of the cotton, was more than sufficient to pay for the land so bargained to said Jesse.

The bill charged, that the complainants were, at the date of their purchase, wholly ignorant of these facts, and that Jerry Beall, after Jesse's death, who was killed in 1863 in the Confederate army, had studiously concealed from her, Jesse's widow, the facts with regard to the land.

The bill prayed a discovery of the contract between Jerry Beall and Jesse, that Jerry Beall should be compelled to account for the proceeds of the cotton and the trust funds, make titles to Mrs. Clark, and the infant son of Jesse, (who was made a party,) to the land, and that the suit on the notes be perpetually enjoined, and for general relief in the premises.

Jerry Beall answered the bill denying that he had ever

Clark *et al.*, *vs.* Beall.

given or contracted with Jesse Beall for the lands, stating that Jesse Beall was on the place as his agent, and not in his own right, and, in pretty decided terms, denying all the charges in the bill about the rights or claims of Jesse Beall, or of Mrs. Jesse Beall and her son, to the land. The cotton, too, he said, was his, though he admitted it was marked Jesse Beall, but he set up that this was his son's act, and merely done to distinguish the cotton made on that place from cotton made at his, Jerry Beall's, other places, of which he had several. The answer admitted that he had compromised with Woodward's heirs, (Woodward had died,) taking a title to the land to himself from them, and giving up $30,000 00 of the Woodward notes; this, he admitted, he was bound to credit on the notes of complainants, and this he was ready, and always had been, to do.

There was also a demurrer to the bill, for want of jurisdiction in the Superior Court of Dougherty county, for multifariousness in the bill, and for general want of equity.

The complainants filed various affidavits; one of Mr. J. Cannon, who was overseer on the place in 1861. He swore that Jesse Beall claimed the place as his own, and that until Jesse went to the war, Jerry Beall took no control over it. Cannon also swore that in 1863 Jerry wrote to his son that he had bought *for him* the Echols' place. He also swore that he had heard Jesse and his father talk of this Echols' place before this, that Jesse had urged him to buy it for him, and that his father had replied, " you had better wait till you have made the money to pay for the place you have got." Cannon also says, that he had Jesse Beall's note for his services as overseer in 1860 and 1861; that after he, Cannon, came home from the war, he had presented it to Jerry Beall, who refused to pay it, saying he did not pay Jesse's debts, though, at a subsequent time, the note was paid by Jerry Beall. Cannon's affidavit also stated, that in the spring of 1860 he heard Jerry Beall say to Jesse, "this plantation and property is yours when you make the money to pay for it at what it cost, and it will be an easy matter for you to do it if you are

Clark *et al.*, *vs.* Beall.

economical and industrious;" that this was said on the Wilkin's place when he, Cannon, was overseer.

It was charged in the bill, and admitted in the answer, that from shortly after the marriage of Eugenia with Jesse Beall, which was in 1861, some twenty or thirty negroes, belonging to her before her marriage, were worked on the plantation, though Jerry Beall's answer said that this was by his permission and agreement to account for their labor, which, as it was during the war, was worth but little. It was proven by several that the cotton made on the place was marked Jesse Beall, and Mr. Rust, the warehouseman, filed an affidavit that he had received in 1865 a letter, which was lost, from Jerry Beall, directing him to ship "Jesse Beall's" cotton to him, which he did. There were affidavits showing from five hundred to six hundred bales of this cotton marked "Jesse Beall." There was also the affidavit of John R. Lee, who stated that from 1860 to 1865 he was one of Jerry Beall's overseers; that Jesse Beall controlled the Wilkins' place, and had an overseer there in 1861 and 1862, and that in 1861 Jerry Beall told him he had bought that place for Jesse, and it was to be his, or he intended it for him, when it was paid for—that three hundred bales of cotton were made on the Wilkins' place in 1861.

Jerry Beall admitted having taken possession of the cotton, but stated that it was his cotton, and not Jesse Beall's. It was in proof also, that in 1865 Jerry Beall had sold two of the lots of land of the Echols' and Wilkins' tracts, with other lands, in a body, to an English company, and Lee's opinion was that those two lots brought Jerry Beall in the sale $6,000 00.

The demurrer, and the motion to dissolve the injunction on the coming in of the answer, were heard together. The Court sustained the demurrer in so far as the bill proposed to go into the several trusts which were in the hands of Jerry Beall for the use of Jesse Beall; and the Judge further held, that the answer of the defendant completely denied all the equity there was in the bill, or appeared from the affidavits, and that the injunction ought to be dissolved,

except as to $30,000 00, the amount received from Woodward's heirs on the land, in the settlement between them and Jerry Beall.

The equity set up by the complainants' case, as it stood before the Chancellor, was this: That these notes were given for the land in ignorance of the fact that the land did not belong to Jerry Beall, but that it was in equity the property of Eugenia Clark and her son, and that this fact was fraudulently concealed by Jerry Beall; that, in fact, there had been a contract between Jesse Beall and his father by which Jesse was to own the land when he had paid what it cost, and that the Echols' place had been bought for him; that in the effects of Jesse, to-wit: the cotton that had gone into his hands, and the trust estate in his hands, there was more than sufficient to pay for it, and that in pursuance of the contract Jesse Beall had been put in possession, and for several years the negroes, which came by the wife, had worked on the place, and all the proceeds of the labor of Jesse and the negroes had gone into his father's possession.

We do not think under our peculiar system, which requires all suits in equity to be brought in the county where the defendant lives, that Mrs. Clark can, by a bill filed in Dougherty to enjoin these notes, have a decree for an account and settlement of these two outside trust funds; but if such a contract as she sets up did, in fact, exist, if Jerry Beall, by the cotton which went into his hands, and by the funds which he actually holds of Jesse Beall's, has been paid for this land, we do not see any objection to considering those funds, as in his hands, to be appropriated in that way, so far as it may be necessary. If Jesse Beall were now in life, pressing for an account of these trusts, and Jesse did, in fact, owe to his father a fixed sum for this land, without doubt that debt might be allowed as a credit to his father in a trial in Baldwin, of a bill filed by Jesse in that county against Jerry Beall seeking an account of these trusts. And we can see no reason why, when, in the *defence* of these notes, the true title to this land comes in question, it is not competent to show, that at the time of the purchase, or subsequently, Jerry Beall had in his

hands monies of Jesse sufficient to pay for them, no matter from what source those monies were derived, it is not so much a question of accounting for the trusts; that under our peculiar statute, regulating the jurisdiction of our Courts by the residence of the defendant, could not be called for in this way. But the vital question here is, whether Jerry Beall has in fact received pay for these lands from Jesse. What difference can it make whether Jerry Beall got his pay for these lands in cash paid him, or in cotton which he appropriated, or in other money or means of Jesse in his hands, then and now as trustee of Jesse? Suppose it should appear on the trial of this case that, in fact, Jerry Beall did buy the Echols land for Jesse, as Cannon's affidavit asserts, and that, at the very time, he had funds of Jesse's in his hands sufficient to pay for it, would it be a lugging in of foreign matter to show that this was the fact? If, as all admit, it is a proper defence to these notes to show that the land for which they were given was, in fact, at the time of the sale, not the property of Jerry, but of Jesse Beall's widow and son, *then any fact* going to show the truth or untruth of that position, may be inquired into. Very often in the investigation of pleas of failure of consideration, or in suits upon covenants of warranty, it becomes necessary to show, by evidence, the validity or invalidity of titles to land, and that even before a Court which could give no judgment that would settle the title. In the case of *Dobbs vs. Justices*, etc., 17th Ga. R., 64, this Court held that a sheriff, when sued for failing to make a levy, might show in defence that the defendant in execution had no title to the property pointed out. This might involve as a fact pertinent to the sheriff's defence, a full investigation of the title to land in a county different from that in which the land lies. So, too, in *Baynes vs. Bernhard*, 12th Ga. R., 250, it was held that in a suit on a bond for titles the plaintiff might show that the defendant never had any title to the land. As a matter of course, he must do this by showing title paramount in somebody else. And it is the common practice in this State to permit the defendant, under a plea of failure of consideration to a note, to show that the note

Clark *et al.*, *vs.* Beall.

was given for land, the title to which was warranted and had proven utterly void. Nor would the fact, that the land lay in another county than that where the controversy was had make any difference, nor that the Court had no jurisdiction to try a case involving titles to land. The distinction is between undertaking to decree and settle a matter over which a Court has no jurisdiction, and in investigating questions collateral to the matter in dispute, (over which the Court has jurisdiction,) but which are necessary to be inquired into in order to get at the truth of the controversy before the Court. In the case of *Smith's administrator vs. Bryan*, 34*th Ga. R.*, 53, this Court held, that the Superior Court in Macon county was the proper tribunal to appeal to, in order to set aside a deed to a lot of land in Lee county, made by Smith to Bryan, who lived in Macon. The proceeding was a personal one against Bryan, and Macon county Superior Court had the jurisdiction, although to investigate the question it was absolutely necessary to inquire into the validity of the title to land lying in the county of Lee. So in this case the question is, whether or not these notes shall be enjoined; that involves, as collateral to the judgment, the question to whom the lands belonged at the time of the sale, and under the state of facts as claimed by the complainants, this depends almost entirely on the other question, viz: whether they were paid for. How that was done does not, as it seems to us, involve the question of jurisdiction; it may have been in money, cotton, services, or in money in Jerry Beall's hands belonging to Jesse.

Whilst, therefore, we think the Court below was right in holding that the Superior Court of Dougherty had no jurisdiction to decree an account and settlement of the trust funds mentioned in the bill, we are yet of opinion that if such funds were in fact in his hands, and it be proven that he bought the Echols place for Jesse, he may be charged with those funds in the determination of the question, whether or not Jesse has paid him for the land. Whether that has been done or not, may, it is true, involve, as collateral to the question in dispute, an investigation of the amount of the trust, but that is a very different thing from a decree, settling the

Clark *et al.*, *vs.* Beall.

trust matter. Our Statute, section 4124, of Irwin's Code, expressly enacts that a bill filed to enjoin a suit at law may be filed in the county where the suit is brought when *no relief is prayed for as to matters not included in the litigation.* The litigation here is the justice and legality of these notes; to settle that it is absolutely necessary to inquire to whom the land belonged, and that inquiry involves in this case, whether it has been paid for, which latter question depends upon whether Jerry Beall, by the cotton which he *is* charged to have appropriated, or by funds of Jesse otherwise in his hands, has received what it is contended Jesse was to pay.

A Court of Equity will not stop in the investigation of a question properly before it, because its determination involves collateral questions, but will go on to do equity between the parties, however complicated the inquiry may be. In England, it will not only investigate, but decree as to all such questions, though by our statute this power to decree is limited by the clause of the Code referred to. If, upon the trial, it is made to appear that, in fact, this land was bargained to Jesse, or a part bargained to him, and a part purchased for him, and by the means which Jerry has appropriated belonging to Jesse, it has been paid for, then these notes ought to be enjoined and this land be decreed to be the property of the proper representatives of Jesse Beall. Whether Jerry Beall is still in arrears to Jesse Beall in this trust fund, and should be compelled to account for and settle it, is a distinct matter, which must be inquired into by the Court of the county of his residence.

The real incongruity, in this view of the matter, is not the inquiry into the facts about this trust fund, but the want of power in the Court (after it has, for the purpose of getting at the rights of the parties to these notes, gone *into* the inquiry) to decree and finally settle the trust, as well as the other matters in dispute. This power, as we have said, a Court of Equity in England would have, but under our peculiar statute this power is wanting. The ordinary rule that when a Court of Equity takes hold of a matter it will *decree* a final settlement of the whole matters involved, is

Clark *et al.*, *vs.* Beall.

modified by this section of the Code, so far as that it can only decree and grant relief as to matters involved in *the litigation.* How far this extends, each case must settle for itself. In analogy to the rulings of the Court, made in its early history, we think a decree settling this trust is going too far, but we also hold that this does not prevent an investigation of the fact, and the use of it, as we have said above.

2. Even if the charges as to the sale of the land to Jesse, and his payment of the purchase-money, etc., are not found to be true by a jury, we think there is equity in the bill not sworn off by the answer in the transactions charged with reference to the Woodward notes. It is alleged that the complainants sold their lands to Woodward, taking a mortgage, and placed the notes and mortgage in Jerry Beall's hands, as collateral security. This Beall admits, and admits further, that under authority from the complainants to settle with Woodward's heirs, he has taken a title to the land, giving them up only $30,000 00 of Woodward's notes.

We are of opinion that in this settlement, as the facts thus far are made apparent, Beall acted as the agent of complainants, and that he cannot be permitted to make a profit to himself by the transaction. As he got a title to the land, it was his interest to get it as low as possible, and it was the interest of the complainants that as large as possible a credit should be put upon their notes from the proceeds of the Woodward notes. Beall's private interest, and his duty as the agent of complainants, were in opposition, and there is equity in this bill to decree that the true value of the land (not the amount Beall may have in fact given up of the Woodward notes) shall be credited on the complainants' notes.

The injunction ought to have been held up for this, if for no other purpose. Without question there is some defect in the complainants' case on the ground of parties. Jesse Beall's estate ought to be represented as well as the child. But as this does not appear from the record to have been passed upon by the Court, we will presume that had he so intimated, the bill would have been amended. We think

that ought to be done. Jesse Beall's estate, as well as the son, ought to be parties.

We pass no opinion upon the merits of this case on the evidence, except to say, that as it stands it ought to have gone to a jury before the dissolution of the injunction. The real merits of the controversy must depend upon the proof then made, and we leave that tribunal to determine it on the evidence as it shall be presented.

Judgment reversed.