BEALL *et al.*, executors, *vs.* CLARK *et al.*

1. So far as concerns the principles laid down in 39 *Ga.*, 533, as applicable to this controversy, the case is *res adjudicata*, but not further.

2. Where, after the trial of a case, the defendant discovered testimony to show that complainants, desiring to have a leading witness on the stand personally, entered into a contract with him that, if the testimony of the witness resulted in recovering certain plantations, they would employ him to oversee such places at a salary of $1,500 per annum, and that one of the jurors was a half brother of such witness, a new trial should have been granted.

(*a.*) The counter-showing did not relieve the testimony of the witness from suspicion, or render the juror competent.

3. A parol contract for land, on which specific performance is sought, should be made out so clearly, strongly and satisfactorily, as to leave no reasonable doubt as to the agreement.

(*b.*) A specific performance of a voluntary agreement, or merely gratuitous promise to convey land, will not be decreed. There must have been possession of the land given under the agreement, upon a meritorious consideration, accompanied by valuable improvements made upon the faith thereof.

(*c.*) A contract by one to transfer to his son certain plantations as soon as the latter should pay the cost of the same, it being the intention that such payment should be made from the profits of

the plantations themselves, was deficient in mutuality and a nude pact.

(*d.*) This case differs from those in 33 *Ga.*, 9, and 54 *Ib.*, 523.

4. Statement of the questions remaining to be disposed of in the court below.

January 15, 1884.

New Trial. Witness. Jurors. Contracts. Title. Specific Performance. Parent and Child. Presumption. Before Judge Bower. Dougherty Superior court. April Term, 1883.

Jeremiah Beall brought complaint to the June term, 1868, of Dougherty superior court against J. A. Pace (now McLaren), E. A. Beall (now Clark), and M. L. Bryan, on two notes for $20,000 each, dated January 23, 1866, due January 1st, 1867 and 1868. The defendants filed pleas: First, that the notes were fraudulently obtained, in this, that the plaintiff represented that he was the owner of the Wilkins and Echols plantations in Lee county, for which defendants gave three notes of $20,000.00 each, two of them sued on, when he had no titles thereto ; that they belonged to the estate of Jesse Beall; so the notes are void. They tendered back the deed, and prayed that the trade be canceled. Second, that the plaintiff represented that he was the legal owner of said land; that since the sale, Mrs. Beall had learned that plaintiff agreed to convey said land to his son (her husband), Jesse Beall, in 1861, and put him in possession; and that during Jesse's lifetime and since his death, plaintiff had received 600 bales of cotton, worth $75,000. That plaintiff had refused to carry out the trade or pay her and her son, Jesse's only heirs, for said cotton. Offer to set-off, and pray judgment for the balance. Third, that the said Eugenia is entitled to recover one-half of $160,000 of plaintiff, amount received as the property of Jesse Beall, deceased, and not accounted for; and that plaintiff in 1865 and 1866 received 600 bales of cotton of Jesse Beall's estate, worth $100,000, and also $10,000 trust

funds, due said Jesse from his grandfather Moughon's estate, and $50,000 trust money from Sanford's estate, none of which has been accounted for; one-half of all which is due said Eugenia, and she offers to-set off the same. Fourth, that in 1860 plaintiff made a parol agreement with his son Jesse to convey him the Wilkins place for what it cost, $90,000, and that Jesse could pay it with the cotton crops to be grown on the place, or as he might choose. That Jesse went into possession, and made valuable improvements under said agreement. That to encourage his son, Jesse, and at his request, plaintiff, in 1862, purchased the Echols place for $30,000, in Confederate money, and included it in said agreement; that he retained possession until his death; that, under said agreement, plaintiff received all the cotton aforesaid, and converted the same to his own use; that all the sums aforesaid greatly more than paid for said land; and that said plantations both belong to Eugenia and her son, the sole heirs at law of said Jesse. That these facts were unknown to defendants when they gave said notes; that plaintiff fraudulently represented himself to be the owner of the land, when such was not in fact true. Guardian *ad litem* for her son, and special verdict prayed for, and that the notes be declared void. They prayed to cancel the sale; that plaintiff be required to execute titles in accordance with the parol agreement with Jesse Beall, and pay the balance due.

Defendants in the common law suit filed their bill in equity, to the December term, 1868, of court, setting up the same facts set up in the pleas, and that they gave $60,000 for said places, and sold them to one Woodward for same amount, and turned his notes over to Jeremiah Beall as collateral security for their notes, in 1866; that said Beall is pressing their collection; that said Beall, by some arrangement with said Woodward, had got back into possession of said places, and had both the notes of said Woodward and complainants, without giving complainants the proper credits therefor. That in 1861 Eugenia

Coley was married to Jesse Beall; she had 20 negroes, all good hands, which Jesse received and worked on the Wilkins place, which he was managing and working at the time, and had been since January 1, 1860, as his own; and did so till spring of 1862, when he went to the war, leaving an overseer on the place; that in 1862 defendant purchased the Echols place, and worked both places with Eugenia's and Jesse's negroes, until the sale to complainants in 1866, receiving all the crops, as well as the ones already raised; that Jesse was killed in 1863; left a wife and one child; learned since their purchase that Jesse went into possession of said place, partly as a gift and partly as a purchase. It is reasserted that they knew nothing of the contract between Beall and his son, Jesse, when they purchased; that they relied entirely and implicitly on the statements of said Beall, when they purchased, as to his ownership; that said Eugenia was a minor, and he was her father-in-law. They set out the same amounts of said Jesse's assets going into his father's hands as is stated in their pleas, and alleged that Beall well knew the property was his son's, and they did not. They charged that all of said property was an absolute gift from Beall to his son, at the time he took possession, at least the larger portion of it; all of which Beall concealed from said Eugenia, saying his son, her husband, died leaving no estate; that defendant concealed from her the fact that her husband had trust property coming to him as set out in the pleas, he well knowing it. That defendant is trying to sell said lands to leave the state, and has no bonds to secure the trust funds aforesaid, and that the sale to them, for the reasons aforesaid, is fraudulent and void; that he had all the money of his son; that the places were paid for. They ask an injunction against the selling of any of said notes or lands; that the lands be decreed to said Eugenia and her son, and that said Beall be required to account fully, etc. The complainants waived discovery. After the purchase of the places, Mrs. Pace was married to Peter McLaren, and Mrs. Beall was

married to C. M. Clark. C. M. Clark, as guardian *ad litem* of Mrs. Clark's son, and as her husband, was also made a party, and general account and settlement asked for. Beall, the defendant, lives in Baldwin county.

On January 3, 1871, C. M. Clark, administrator on the estate of Jesse Beall, filed an amendment to the bill, alleging that, since the grant of the injunction, defendant had obtained letters of guardianship for Jesse S. Beall, minor son of his wife, from Baldwin court of ordinary; that said minor was not a resident of Baldwin county at the time; that no notice was given to the mother; and that, by virtue of said letters of guardianship, he was trying to sell a part of the estate of Jesse Beall, deceased, when Clark, administrator, has an action of ejectment pending against the tenants of said Beall for the lands. At June term, 1871, C. M. Clark administrator, was made a party defendant to said bill.

Jeremiah Beall pleaded to the jurisdiction and demurred to the bill. The plea was stricken, and the demurrer overruled. He filed an answer setting up, in brief, as follows: He did sue the notes, and justly so, to recover the balance due him for said places. The notes were given for the Wilkins and Echols places in Lee and Terrell counties; he made complainants a valid and legal deed to the same, and took the notes set out and a mortgage on the lands sold to secure their payment. Complainants sold the land to one Woodward for $60,000, and made him titles, and took notes and mortgages. Complainants cultivated said lands in 1866, but never paid any portion of the purchase money. After the sale to Woodward, complainants turned over his notes and mortgage to defendant as collateral security for the original purchase money due, and had the same so expressed in the mortgage, with the distinct contract and understanding that this defendant should have the right to collect, settle and compromise the same as he might deem best, and credit the sum realized on complainants' notes. He has been put to much trouble and expense. Soon after Woodward's

death, his sons, without defendant's knowledge, but, as he believes, not without the knowledge and consent of a portion of the complainants, disposed of nearly all the personal property on said place, and sold the cotton crops made thereon, and the corn and other things were seized to pay for labor.    The widow of Woodward threatened to take dower.    Lands in the meantime had greatly depreciated. The places were in bad condition and repair, and not salable for half their value as when sold to complainants. To settle up the matter as to Woodward's estate, and get out of all controversy, it was agreed that the defendant should receive back the plantations and any personal property that might be left, with good titles, for $30,000, which was to be paid by the delivery of said Woodward's last note due, for $20,000, and a credit of $10,000 on the second note due, and should hold the balance against the estate, which is utterly insolvent, though the notes are in the hands of counsel, for collection.    This credit of $30,000, less expenses, complainants are entitled to as a credit on their notes, which this defendant has repeatedly offered to make by giving up their note last due and not sued, and crediting the remaining sum on their second note.    This will leave due defendant over $30,000 and interest, for which he wants judgment.    Such was the destructive manner in which the place was run in 1866 and 1867, and such the depreciation of property and loss in the personal property, that $30,000 was enough for it, when he took it back.    It is not true that this defendant ever urged or persuaded, or ever desired the said Julia A. or Eugenia to purchase said lands.  On the contrary, this defendant had promised to sell the place to an English company for cash, and promised it the refusal at the same price.   Mrs. Pace and said Eugenia importuned defendant to sell to them and one Bryan, whom they claimed to be a good man and manager and controller of labor.    Defendant finally consented to give up the cash offer, and let complainants  take it on time.    So he applied to the company, and it, unfortunately, released

him; and, prompted by a desire to oblige complainants, he sold them the lands on a credit, and gave his son's widow the personal property, consisting of 26 mules, 8,000 bushels of corn, 300 head of hogs, 8,000 or 10,000 pounds of pork, 50 or 60 head of cattle, peas, fodder, wagons, tools, etc., estimated at $10,000. Nothing but kindness to Julia A. and the said Eugenia, his daughter-in-law, prompted him, and it is painful to know that nothing but great loss and greater ingratitude have been the returns. Never made any misrepresentation to complainants about the lands or titles, or anything else, nor said anything to induce them to purchase. He never gave or offered to give or sell, or promised to sell to his said son, Jesse, said land or property, or any portion thereof. Defendant purchased the Wilkins place in 1859, and all the stock, wagons, etc., for some $90,000, giving notes secured by mortgage on the property. 'I placed my son, Jesse, on the place to give habits of business and to learn him to be a planter. He was under age; superintended with an overseer. I sold the crop of cotton of 1860 in the fall of that year, and after paying off debts my son had improvidently contracted during the year—many without consideration—(I hesitated long before I would agree to settle them), and on paying current expenses, left nothing to pay on the debt for the place. This made it a question of deep concern, and I made it a matter of family consultation, and concluded to sell the place, but found no purchaser. Drew in my mercantile business, and with a skillful operation made money, and in a measure relieved myself. Jesse's habits were bad. In July, 1861, he left the place entirely. In the spring of 1862, I equipped him, and he entered the army. In the fall of that year, I bought the Echols place, which at the time constituted the bulk of my estate.

'In the winter of 1862, while Jesse was at my house on furlough, he said his wife's mother was paying $2,200 for hire of his wife's negroes, and that I might take them at same, and put them on the Wilkins and Echols places. I

did not need them, but took them for accommodation. My son was killed in 1863, and the hire afterwards was paid to his wife. Denies positively any agreement about the sale or gift of the land as charged, or in any other way.

'In the fall of the first year Jesse was on the place, he had a brand for cotton cut with his initials. It was used for the succeeding years, up to the year I sold out. That accounts for the number of bales stored in this brand. The amount is overestimated by complainants, but whatever it may be, all of it was raised after he left. Jesse distinctly told his wife, the last interview he had with her at my house, that I had never given him off any property.

'Did not think it necessary to administer on my son's estate, as he had nothing but what he got by his wife. I paid his debts, about $6,000, and $3,000 more to remove his remains and procure suitable monument. His widow made my house her home. I paid her bills, her traveling expenses to New York and Baltimore and various watering places; never refused her money; kept no account.

'There is not the slightest foundation for the charge that he gave or sold his minor son said property. The cotton brand was the act of his son, to simply distinguish the cotton raised on that place. How could such an act be tortured into the idea of his giving or selling one of his minor sons the chief portion of his estate, and it not paid for—his son with bad habits, which defendant was trying to correct when he sent him to the place, and when he took him away? Therefore, all the charges in said bill to the contrary are false and groundless.'

The defendant will account for the trust funds according to the time and provisions of the will under which he acts; but he is not liable to account to complainants for the same, and this is another wholly separate and distinct matter from the notes sued on at law, or any issue that can be made touching said notes. The title made to complainants is a good one, has not and cannot be broken, and the case pretended to be made by the bill is denounced as

false, groundless, wanton and manufactured from beginning to end. Admits the marriage, but denies the right of C. M. Clark to be guardian *ad litem* without security. The share of Jesse in the Sanford estate was $14,000 in worthless notes, 16 shares railroad stock, an interest in some land not yet to be counted, a few shares of the Bank of the State of Georgia and some Confederate securities, both the latter worthless. Two lots of land in Dougherty county, a house and lot in Milledgeville, the whole worth $5,000 or $6,000, comprise the Moughon trust, and Jesse is entitled to one-third of that. All the trust will not amount to more than enough to pay the amounts advanced for said Jesse since his death.

The reason his estate has not been administered is, that it was an agreement in the family that his widow should keep all his property, and Jesse, his son, should have what came to him from his kin. With this view, defendant was willing to pay his debts; and this arrangement was highly pleasing to said Eugenia. Denies all fraud, misrepresentation and combination, and again avers the trade honest, fair and legal.

The evidence was very voluminous, and need not be set out in detail. It is only necessary to state, in addition to what is set out in the decision, that Jasper Cannon, a leading witness for the complainants, stated the agreement between Jeremiah Beall and his son, Jesse S., as follows:

Jasper Cannon sworn for complainants: "Does not desire to refresh his memory from affidavit made before. Heard defendant Beall tell his son, Jesse, if he would go on the place and go to work, and be economical, when the place was paid for, it would be his. Jesse took possession of the place under that statement. Know it, because I was with him, as overseer, 1860, 1861 and to May, 1862. Jesse controlled it during that time. He said it was his. Between 130 and 160 bales cotton were raised on the place in 1860; over 300 in 1861. It was branded—'J. S. Beall'; carried to Sims & Rust; I carried it. I was employed by Jesse Beall;

he went to war in spring of 1862, and left me in possession. When asked if anything was due him after the war for wages, he said he was talking to Maj. Wooten about it. I had Jesse's note for $60 for wages; presented it to defendant for payment; he refused, saying it was Jesse's debt, and proposed to shave it. Read my affidavit this morning; Jesse Beall gave me orders on the place; Jesse did the bidding for the mules; bought about 20; I helped, at Jesse's request, who continued to claim the place up to his death; Mrs. Clark's negroes were not carried there until after I left; found some of the Sanford estate negroes there after I came back, and Beall's and his wife's negroes were on both the Wilkins and Echols places; Jesse referred me to his father, when he left, for instructions, and he came and gave me directions once, I think; the cotton was all delivered before Jesse left; found defendant managing the place when I came back from the war; both places worked together; some of the mules I left were there, and some others bought; I think all the negroes were working to gether; Jesse claimed the Echols place; both are in Lee county, probably three lots of each in this county; defendant's wife died in 1861, after Jesse married: 2,000 acres open land on the places, most of it good, worth two or three dollars, on an average, for rent; taking into consideration the high prices and low prices paid for rent, I think three dollars and fifty cents would be enough from 1866 to the present time; Jesse Beall lived in this county when he died.

"I was living on the Beall place when defendant bought Wilkins; Jesse hired me about two months before Wilkins was bought; he said his father was going to buy him a place, and wanted me to go into it with him; Jesse was wild and dissipated; defendant wanted to reform his son, and wanted to give him something to do, and told me to go on the place with his son and try to get him to be steady, and keep him straight."

The jury found and the chancellor decreed that the notes sued be enjoined and not collected; that the Wilkins and Echols places were both the property of Eugenia Clark and Jesse Beall, heirs of Jesse S. Beall, deceased, and that there was $32,125 in the hands of defendant, due said heirs, over and above any trust funds.

Defendant moved for a new trial, on the grounds stated in the decision. It was overruled, and defendant excepted.

C. B. WOOTEN; D. H. POPE, for plaintiffs in error, cited Code, §2483; 12 *Ga.*, 278; 1 *Id.*, 381; 57 *Id.*, 550; Code, §§5168, 3403; 29 *Ga.*, 105; 36 *Id.*, 653; 38 *Id.*, 106; 28 *Id.*, 439; 47 *Id.*, 538; Code, §3716; 20 *Ga.*, 242; 35 *Id.*, 177; 45 *Id.*, 175; 5 *Id.*, 341; 17 *Id.*, 559; Fry Spec. Perf. Con., §387; 34 Pa. St., 475; 71 *Id.*, 161; 79 *Id.*, 421; 85 *Id.*, 428; 39 *Ga.*, 533; 12 How., 126; Fry Spec. Perf. Con., §599; 59 *Ga.*, 136; 5 Am. R., 556; 1 Md. Ch., 244; 23 Miss., 378; 1 Leigh (Va.), 36; 54 *Ga.*, 59; 44 *Id.*, 129; Code, §2857; Fry Spec. Perf. Con., §§608, 693; 2 Wheat., 336; 1 McLean, 395; 4 Scam, 202; *Sup.* 33 *Ga.*, 136; 50 *Id.*, 252; 56 *Id.*, 596; 30 Ala., 366. Fry Spec. Perf. Con., §286 *et seq.* and notes; Harr. Ch. (Mich.), 124, 420; 10 Wall., 339; Code, §3189; 54 *Ga.*, 623, head-note 5; 3 *Id.*, 446; 7 Cow., 360; 6 Paige, 323 17 *Ga.*, 204; 30 *Id.*, 891; 37 *Id.*, 289; 48 *Id.*, 193; 44 *Id.*, 174; Code, §3792.

G. J. WRIGHT; R. F. LYON; W. A. HAWKINS; D. A. VASON; W. E. SMITH, for defendants, cited 39 *Ga.*, 533; 34 *Id.*, 486; 8 *Id.*, 23; 37 *Id.*, —— ; 38 *Id.*, 195; 35 *Id.*, —— ; Code, §3854; 45 *Ga.*, 458; 42 *Id.*, 120; 50 *Id.*, 203; 57 *Id.*, 489, 492; 48 *Id.*, 142; 52 *Id.*, 344; 54 *Id.*, 564; 55 *Id.*, 169; 56 *Id.*, 84; 57 *Id.*, 609; 50 *Id.*, 210; 41 *Id.*, 426; 61 *Id.*, 299; 60 *Id.*, 601, 619; 59 *Id.*, 56; 58 *Id.*, 590; 41 *Id.*, 657; 42 *Id.*, 463, 407; 47 *Id.*, 230, 545, 583; 44 *Id.*, 354; 56 *Id.*, 401; 61 *Id.*, 430.

HALL, Justice.

1. This case was before the court at June Term, 186´, upon exceptions to a decision modifying the temporary injunction which had been ordered. 39 *Ga.*, 533. It was finally tried upon the pleadings 'as they then appeared, together with an amendment, which was suggested by the opinion delivered at that time. So far as concerns the principles then laid down, as being applicable to the matters in controversy between the parties, it is scarcely necessary to remark that they are *res adjudicata*, and binding both upon this and the lower court, in all further trials of the case. We do not carry the estoppels consequent upon this judgment to the extent, however, that the very eminent counsel for the complainants in the bill insisted, with so much earnestness and plausibility, it should be carried. We cannot agree that it should preclude an examination into the testimony had upon the trial, to sustain the various claims set up by complainants' bill against the defendant. We are of opinion that it falls far short of the effect which it was thus contended should be attributed to it. The court, in that opinion, was careful, as it seems to us, to guard against this claim, and to disclaim any purpose of binding the courts in subsequent proceedings to the extent now insisted upon. In the last head-note of the decision it is said: " When, as in this case, the injunction to stay proceedings at law is the principal object of the bill, and a temporary injunction has been granted, the court ought not to dissolve the injunction, and permit the case to proceed, unless it clearly appear, from the evidence before it,. that there is no case proper to be submitted to a jury for a decree." All, therefore, that was decided upon this point was that there was sufficient evidence then before the court to carry the case to a jury, and that complainants were entitled to an injunction to effect this object. That there might be no mistake as to the meaning of the court, in this particular, McCay, J., who acted as its organ, said, p.544,

Beall *et al*, executors, *vs.* Clark *et al.*

in concluding his remarks: "We pass no opinion upon the merits of this case on the evidence, except to say that, as it stands, it ought to have gone to a jury before the dissolution of the injunction. The real merits of the controversy must depend upon the proof then made, and we leave that tribunal to determine it on the evidence, as it shall be presented."

We apprehend that this direction was not regarded as it should have been, on the trial which has taken place in the lower court, and which is now here for review upon bill of exceptions and writ of error, sued out and prosecuted at the instance of Jeremiah Beall, the defendant in the original proceeding, who has, since the argument of the case in this court, died, and whose executors, James and Joseph Beall, have, by order, been regularly made parties in his stead, and in whose names, as such executors, the case is now proceeding.

Upon the hearing, much evidence was taken, and after the court's charge to the jury, they found in favor of the complainants, enjoining the common-law suit in favor of defendant, Beall, against the complainants, awarding the heirs of Jesse S. Beall, deceased, the Wilkins and Echols plantations, and the sum of thirty-two thousand, one hundred dollars, all over and above any trust funds. A decree was rendered on this finding, and the defendant moved for a new trial, upon the following grounds, which motion was overruled:

(1.) Because the court erred in sustaining the complainant's demurrer to defendant's plea to the jurisdiction, which is a part of the record in this case, and which is referred to and made a part of this motion for new trial, said plea showing that this court had no jurisdiction of the case, under the laws of this state.

(2.) Because the court erred in admitting as evidence, over the objection of defendant's counsel, the table known as Barber's Table of the value of Confederate money during the late war, as set out in the 34th *Georgia Reports*, p. 487,

the defendant objecting thereto, because said table was no proof of the value of Confederate currency, and because the same was irrelevant and illegal and inapplicable to this case.

(3.) Because the court erred in allowing C. M. Clark, as administrator of Jesse S. Beall, and as guardian of Jesse Beall, to come in, having been made a party defendant by amendment to the bill in 1871, file his answer and litigate the case as a defendant, over the objection of defendant's counsel, who insisted that he should have been made a party complainant, if a party at all, the answer of said Clark not having been filed until this term of court.

(4.) Because the court erred in admitting the exemplification of the records of the wills of Thos. Moughon and William Sanford, and the returns made in connection therewith;—defendant objecting thereto on the ground that they were illegal and irrelevant to the issue, and ought not to be inquired into in this case.

(5.) Because the court erred in ruling out and excluding the following portions of the depositions of the defendant, taken by interrogatories, to-wit: "And told my son, Jesse, just entering his 19th year, to go on the place and assist Mr. Cannon, the overseer, in the management of the farm, as he had no experience in the business; that I wished to make a farmer out of him, and hoped he would be steady and industrious, and to keep out of Albany. He was disposed to be a little wild and extravagant, and difficult to control, and a disposition to run in debt. He contracted obligations that year which I refused to pay, and did not until an appeal was made that it was a debt of honor, and had made it so. After the first year's operations on the plantation, looking to the product, I became very much concerned about my situation." * * * "The sale of the cotton on the place, after deducting all expenses, and the accounts my son unnecessarily contracted, would leave scarcely anything to pay on the mortgage." * * "I made no stipulation or agreement either by word or

deed or promise, not even an understanding, about my son's going on the place." * * * "I had previously forbid him from going on the plantation or having anything further to do with the business. The overseer was notified of this. I at last directed him to take his wife to my home-place, where there were comforts, and where I spent my winters, and he never went back on the Wilkins, except on a visit and of my permission." * * * "The idea never entered into my head that I would turn over my Echols and Wilkins places, with some 100 negroes, to my son, constituti ng the bulk of my estate, to the manifest injustice to my other children. My son Jesse made application to purchase some land for him; spoke of a place in Baker and some other places, stating that Mrs. McLaren intended to turn over to him his wife's negroes; that he had no land, and he was at a great loss what to do with them; that he was going into the service, remarking at the same time that she was paying his wife $2,200.00 hire for them by the year. After talking the matter over, I finally agreed to take the negroes at the same rate and work them on my Wilkins and Echols places, which he readily and gladly agreed to do." * * * *

"When I bought the Wilkins place, I did not purchase it expressly for my son; I bought it alone, and for the purpose of giving my son employment; to make an honorable farmer; to correct those bad habits of his; to start him off in life with correct notions, with integrity, honesty and virtue, and to learn him to deal fairly with all men, so that when he became of age he would be capable and fit for business and life's turmoils." * * * "I put him on the Wilkins place, and said to him that he had a good place, a good set of hands, well trained by his uncle, Joe Bond, and all he had to do was to be steady, attentive, and to keep out of Albany. I repeated this so often, and urged it time and again, that Cannon might have been present and may have said as much to him. Cannon had his orders from me, when Jesse got married, that he had nothing

further to do with the plantation, and Bush, my overseer on the home place had directions to do all he could to help Cannon and Jesse along, for the place belonged to me. I never said to him to go to work and pay for the place. He never could have done that. It would have bankrupted him, as it did many others who bought at Col. Bond's sale." * * * "My son did not have the full and free use of the crops. He did not, in fact, exercise any control over them whatever. He did not pretend to have any, nor never gave an order in relation to them without my knowledge. He had a brand, 'J. S. Beall,' made to brand the cotton with, which I did not engage a thought about, as it was mere matter of pride or fancy on his part. * * * I did not purchase the Echols place at the request of my son Jesse, and did not buy it for him, and never wrote him to that effect in the army, nor neither did I turn it over to the overseer as his property. My son knew nothing about my intentions to make the purchase, or had no knowledge of it until after I had bought it. * * * I only took them for what he said Mrs. McLaren was paying hire for, without asking any questions in regard to the number, or capacity, or quality of the hands. I did not buy the Echols place with any reference to his wife's negroes whatever. It was not talked of nor mentioned by either of us. I bought the Echols place in the fall, and he did not know until near January that Mrs. McLaren was going to turn over his wife's property," * * * " which I agreed to pay to my son in life, and which I intended to carry out in good faith by paying over the money to her."—The same being legal, pertinent to the issues on trial, and should have been allowed to go in evidence to the jury.

(6.) Because of newly discovered evidence, as set forth in the following affidavits of J. L. Dozier, C. B. Wooten, D. H. Pope, and defendant.

Dozier's affidavit: That soon after the bill in this case was filed, Jasper Cannon, who was a witness for complainants, handed deponent a sealed package, saying it con-

tained a contract entered into between the complainants and him, to the effect that if Cannon's evidence gained the Wilkins and Echols places, they, the complainants, would give him, Cannon, $1,500 a year to oversee them as soon as they were gained by his evidence. Deponent put said package away; cannot find it; Cannon lived at his house in 1875, and may have taken it; told Cannon during the trial that his evidence was about to rob defendant, and he felt it his duty to tell of this contract; Cannon told me I ought not to do so; does not remember the exact date said paper was handed him; said nothing of it before. Deponent distinctly remembers that said Cannon said, "If his evidence gained the places, he was to get $1,500 per year for overseeing them."

C. B. Wooten, D. H. Pope and defendant's affidavits: That neither of them knew of the facts set up in Dozier's affidavit until after the verdict rendered. Wooten and Pope were the only counsel for the defendant.—All these affidavits were made after verdict.

(7.) Because the court erred in charging the jury as follows: "But if you should believe, from the evidence, that the agreement set up in the complainants' bill was made by Jerry Beall with Jesse, and that Jesse, acting under said agreement, entered on the Wilkins and Echols places, took possession and control of said places, and worked them under said agreement, and turned over the proceeds to Jerry, and so continued to do, by himself or his authorized agents, until his death, this would give Jesse such an equity as would entitle him, by paying the price so agreed upon, to have the land, and which equity, if existing, would descend to his heirs at law."

(8.) Because the court erred in charging the jury as follows: "You would, therefore, next consider, from the evidence, whether Jesse paid for said lands or not. In considering this question, you will take into account any amount that Jerry Beall had in his hands of Jesse Beall's from the following sources: First, trust funds from the

Sanford estate; second, interest in the two lots sold English company; third, trust fund, the Moughon estate; fourth, the rents, issues and profits in the lands for the years it was held by Jerry, after Jesse's death and before the sale to complainants. The cotton raised on the place in controversy, rents, issues and profits of the place, less the expense, as shown by the evidence, from the time Jesse went in possession until his death, that went into Jerry Beall's hands. If you should believe, from the evidence, that the cotton was Jesse's, then the burden would be on Jerry to show what expense should be taken out of it. Fifth, the rents, issues and profits from the time it was taken back from Woodward estate up to this date. You will look to the evidence to see what amount of funds from each and all of these sources went into the hands of Jerry Beall, as the funds of Jesse Beall, and you will appropriate the aggregate amount of these funds, first, to the payment of the land; and any excess of fund arising from the cotton raised on the place, or from the rents, issues and profits, as before stated, over and above what is required to pay for the lands, you would find for Mrs. Clark, complainant, and her son, Jesse, the said excess, as well as find the lands the property of the heirs of Jesse Beall. If you find from the evidence that the funds aforesaid were not sufficient to pay for the lands, you would find the lands to be the property of the heirs of Jesse Beall, subject to an encumbrance in favor of Jerry Beall for the amount of unpaid purchase money under the agreement between Jerry and Jesse, and you would further find a cancellation of the notes and deeds between Jerry Beall and complainant."

(9.) Because the court erred in charging the jury as follows: " In appropriating the funds of Jesse Beall, as above stated, you will first appropriate those arising from the cotton raised on the land, and the rent, issue and profits of said land, and if they are sufficient to pay for the lands sold under said agreement with Jerry and Jesse, you will

then not consider the trust funds at all, as they will only be taken into consideration by you in case the amount arising from rents, issues and profits and cotton raised on the land are not sufficient to pay for the lands. In that event, you will take into consideration the trust funds, and appropriate a sufficiency of them only to make up the deficiency in the amount of the others in paying for the lands." ["Approved, except that it is a mere extract from that portion of the charge; not even the whole paragraph is here stated, and cannot be fully understood from that portion that is stated."]

(10.) (Disapproved.)

(11.) Because the court erred in charging the jury as follows: "If you should find that only one of the places was included in the agreement of sale between Jerry and Jesse, either the Wilkins or the Echols place, you would make the appropriation of said fund, as applicable to the one place included, in like manner to the payment of such place included in the agreement, and your finding would be under the same rules. You would then further find for Jerry Beall *vs.* all the makers of the notes (subject to the same rules heretofore given you, as to credit on account of the rescission of the Woodward sale), such proportionate amount of such notes as the value of the place not included in said agreement between Jerry and Jesse would bear to the one included in said agreement."

(12.) Because the court erred in charging the jury as follows: "Upon the subject of what funds of Jesse's you can appropriate to the payment of the lands, it is immaterial at the time the funds were received, whether before or after the agreement between Jerry and Jesse."

(13.) Because the court erred in charging the jury as follows: "Unless there is some evidence before you outside of the will of Moughon, creating a trust in favor of Jesse Beall, the money bequeathed by the will of Moughon to his daughter, Jerry's wife, such as was reduced to pos-

session by Jerry previous to the year 1866, would, by law, have become the property of Jerry Beall, the husband."

(14.) Because the court erred in charging the jury as follows: "If the evidence shows that either place was bought in Confederate money, you will observe the date and the table setting the value of Confederate money in determining the price of the place."

(15.) Because the court erred in charging the jury as follows: "If you should find that there was such an agreement as is above stated, and that it was acted under, as before stated, and that there is a sufficiency and excess of the funds arising from the sources other than the trust funds heretofore enumerated to pay for the lands, you should so appropriate it; your finding would be, 'We, the jury, find for the complainants, the heirs of Jesse Beall, the Wilkins and Echols places described in the bill and —— amount for rents, issues, profits and cotton raised on said places, and that there be a specific performance of said agreement, and that the notes, mortgage and deeds made by complainants to Jerry Beall be canceled.'"

(16.) Because the court erred in charging the jury as follows: "If you should find for a specific performance of the agreement aforesaid, and that it required a part of the trust funds to pay for the lands, then your finding would be the same as above, except you would not find any excess for the heirs of Jesse Beall, as there can be no verdict for any excess of the trust funds." "Or, if you should find a specific performance, and all the funds were insufficient to pay for the land, you would add to this, by finding for Jerry Beall the balance still due on said lands, under the agreement between Jerry and Jesse."

(17.) Because the court erred in charging the jury as follows: "Or, if you should find that only one of the places was included in the agreement between Jerry and Jesse, your finding would be under the same rules as applicable to this different state of facts."

(18.) (Disapproved.)

(19.) Because the court erred in giving the following requests of complainants to the jury: "If you should believe, from the evidence submitted to you on this trial, that Jerry Beall, in the year 1859 or 1860, bought the Wilkins place for his son Jesse, and then or afterwards agreed with Jesse that when he paid him the purchase money the same would be his property, and put him in possession of said property, took possession and control of the same under said agreement, and remained there till his death, then you can find and decree that said contract be specifically performed, on the said purchase being complied with." "2. If you further believe that in October, 1862, said Jerry Beall bought the Echols place for the like purpose, and that Jesse accepted and held that place consolidated with the Wilkins place, you may also decree specific performance of that contract, upon proof of payment of the said purchase money. In considering whether said agreements were made, you can look to the relation and condition of the parties, the declarations made by Jerry and Jesse Beall while the latter was in possession of the places, the value of the same, as to who hired the overseer, who controlled and had dominion, in whose name were the crops made and stored, and how marked, and also who paid taxes on the property, and the testimony of all the witnesses, to arrive at the truth; and if, after considering the whole of the evidence, you are satisfied that such a trade or agreement was made, and that the same has been complied with in equity, then you can decree that the said agreements may be specifically enforced." "3. If you should come to the conclusion that the said agreements were made, and the purchase money paid by Jesse Beall, then you can inquire as to the value of the rents of said property from January 1868–9 or 1870, or the time Beall took possession back from Woodward; also the value of all cotton made on said places stored in Jesse's name and appropriated by Jerry Beall, and decree for the plaintiffs any amount you may find in excess of amount necessary to pay for the land,

after using the trusts in the hands of said Jerry, as trustee, and you shall be of opinion that the said amount is due, after paying for the said Wilkins and Echols places, if the excess arises from the rents, issues and profits of land." "4. In determining the question of whether Jesse Beall had paid for said places, you can inquire of the value of what amounts Jerry Beall was due Jesse on the trust estate of Moughon and Sanford, and if you find that Jesse's interest in said estates exceeds the purchase money for the two places, then you may appropriate so much of said amounts as will pay for the places; but you will not find any decree against Jerry Beall for or on account of said trust estate; and if said trust estate will and have paid these said debts, then I charge you that you may so find, and decree the execution of said contract. For it is immaterial whether Jesse paid his father the cash, or whether his father was indebted to Jesse a sufficiency to pay the same. If he had a sufficient amount, that will in equity amount to payment." "5. In arriving at the value of the cotton and the rent of the lands, you can take the highest and lowest proved value; or you can arrive at the value from all the evidence you think would be the true value." "6. If you shall be of opinion that the agreement was made, and the payments made as indicated, and that there is a balance due complainants from the sale of the two lots, the rents, cottons, then I charge you it is immaterial to consider whether the land was sold by Beall and bought back by him. If the land in equity was Jesse Beall's, then the sale and purchase back does not affect the complainants' (unless they have notice of their equities) right to have the contract executed in a court of equity. Therefore, if you believe that the contract ought to be set up in equity, you will enjoin the common law suits, or cancel the notes and deed in the sale by Jerry Beall to complainant."

(20.) (Disapproved.)

(21.) Because the court erred, after giving, or in giving the following charges, as requested by defendant's counsel,

in adding therein and thereto the words contained in brackets: "If the evidence shows that Jesse Beall did not claim said property to be his own, but acknowledged it to be the property of his father, and went upon the same by consent of his father, and with parol agreement on the part of his father that if he would be steady, go to work, make money, and pay what the property cost, the same should be his, and Jesse did not do so, [in whole or in part], but left the place without having paid for the same [or any part thereof], then Jesse acquired no title to the property, [provided said abandonment was final, and not with an intention to return, and was voluntary on Jesse's part, and not the result of any act of Jerry's.]"

(22.) Because the court erred, after giving the following request of defendant's counsel: "If the evidence shows that Jesse was a minor and a boy of wild, irregular habits, and his father placed him upon said property with a view to give him employment and steady habits, and told him, if he would settle down, be steady, go to work, and make money enough to pay what the property cost, he might have it when so paid for, then in order to entitle Jesse to said property and the cotton made thereon, the evidence must show that he complied substantially, at least, with these terms; and if he failed to do so, then he acquired no title to said property, and complainants cannot recover on account thereof; and this is so, although the said Jerry Beall, as trustee, may have had, or afterwards acquired property or assets in which Jesse had an interest," in adding thereto the following: "Unless the failure to comply by Jesse was caused by the act of his father."

(23.)   *     *     *     *     *     *

(24.)   *     *     *     *     *     *

(25.)   *     *     *     *     *     *

(26.) Because the court erred in this, to-wit: He gave in charge to the jury the following portion of a written request of defendant's counsel, to-wit: "In order to hold Jerry Beall bound by a parol agreement as to the land,

the terms of the agreement must be clearly set forth and proved, and though Jerry Beall may have received funds belonging to Jesse into his hands, said funds cannot be applied in payment of said lands, unless there was a contract of sale on the part of said Jerry Beall, and of purchase on the part of Jesse Beall;" and refused to give the concluding part of said request, which was in the following words, to-wit: "By which the parties agreed to such application of funds. The fact that Jerry Beall may have such funds is no reason of itself why the same should be applied to said land."

(27.) Because the court erred in giving in charge to the jury the following portions of a written request of defendant's counsel, to-wit: "If the complainant in his bill relied upon a part gift or sale, with possession, and with the understanding that Jesse S. Beall was to have the property when paid for, then valuable consideration for the agreement is not involved in this case," and adding the following: "Unless there has been a part performance of the contract by Jesse;" and in refusing to give the following concluding words of said request: "And value realized collaterally in other transactions by Jerry Beall from Jesse Beall or his kindred, is not to be considered by the jury."

(28.) Because the court erred in refusing to charge as requested in writing by defendant's counsel as follows: "Suits for lands, whether legal or equitable, cannot be brought out of the county where the land lies ; and if the evidence shows that the land in question is not situated in Dougherty county, then the jury cannot find the same for the complainants."

(29.) Because the verdict of the jury in this case is contrary to law, and without law to sustain it.

(30.) Because the verdict is contrary to evidence, and without evidence to sustain it, and contrary to the weight of evidence.

(31.) Because the verdict of the jury is contrary to the

equity and justice of the case, and contrary to all the principles of equity, law and right.

(32.) Because the court erred in excluding from the jury, when offered by the defendant's counsel, the following testimony of defendant, Jeremiah Beall, as appears in, and was a part of his answer to interrogatories, duly and legally sued out and executed in this case : "The conversation I had with John R. Lee grew out of an allusion made in regard to Col. Bond's will, directing his lands to be sold, and as I thought not politic, and multiplying trouble to his estate, saying that I had a shorter way of disposing of my real estate. I could leave Joe my home place, Jesse my Wilkins place, and Jimmy my lands up the country. I did not say I had given off, for my children were then all under age, and Joe only 14 years of age, and it was a mere casual conversation and intended nothing by it." [Judge's note: "There having been no evidence admitted upon the subject of this conversation or any part of it, I could see no reason why it should be explained."]

(33.) Because the court erred in refusing to let defendant prove by John R. Lee that he and said Lee had a conversation at the Beall place, in said county, in 1860, in which the defendant said to Lee that he had told Jesse, his son, that if he would go on the Wilkins place, become steady and sober, and go to work and make the money on the place to pay for it, he would give it to him, and that defendant's object was to make him steady, sober and industrious; and because the court erred in admitting the sayings of Jesse Beall, as appears in the evidence from several witnesses, which go to show title in himself,—defendants contending that title cannot be set up in that way, and that the sayings of a party against himself, only, are legal evidence in a case like this, and defendants having so objected to such evidence when the same was offered.

(35.) Because of the facts set up in the following affidavit of A. N. Walker : That Jesse Youngblood, one of the jurors

that tried the case, is a half brother of Jasper Cannon, and that they were, at the time of the trial, very intimate and friendly, and are so yet.

(36.) Because of the facts set forth in the affidavit of S. P. Salter: That since the trial of this case, he had a conversation with Jasper Cannon in relation to the paper referred to in Dozier's affidavit. Cannon said, "Let Dozier produce the paper; that he had betrayed confidence, and that he would publish Dozier;" that "Dozier did not, or ought not to know what was in the paper; that it was sealed, and Dozier could not open it; that he did not think the court could open it." Deponent replied that the court could open him, Cannon, and the paper too. Cannon then said, "I have never told Dozier what was in the paper," but that he would tell me. He said, "It contained a contract between him and C. M. Clark, to the effect that when Clark gained the Wilkins and Echols places he, Cannon, should oversee on said places for two years, at $1,500 a year."

Defendant claims that these affidavits show that Jasper Cannon had an interest in the case.

The complainants, by leave of the court, and over the objection of defendant's counsel, made a counter-showing to the foregoing affidavits, by putting in evidence the affidavit of J. R. Lee: That he was the overseer of defendant in 1861, 1862, 1863, 1864 and 1865; had charge of Beall place; Jesse had control of Wilkins, and spent most of his time there; married in summer of 1861; moved his family to Beall place following winter; said it was a better house than was on the Wilkins place; still had control and possession of Wilkins place, claiming it and giving directions to the overseer, Jasper Cannon. In 1861 defendant told me he bought the Wilkins place, and he intended it to be Jesse's when it was paid for; that he intended the Beall place for Joe, and his place in Baldwin for James. There were over 300 bales of cotton made on Wilkins in 1861. Is familiar with Beall place; lands sold to English com-

pany in 1866.   Lots 210 and 213 better than average lots.
Putting the 3,000 acres at $10, he would say these two
lots were worth $15 (per acre).   Sworn to February 27,
1869.

The affidavit of Jasper Cannon : That in first of 1860 he
was employed by Jesse to oversee the Wilkins place in
Lee county.   Jesse was in possession of it, claiming it as
his own ; supposed Jesse had titles to all said property until
the spring or summer of 1860, when he heard his father
say to him, this plantation and property is yours, when
you make the money to pay for it at what it costs, and it
will be an easy matter for you to make it, if you will be
economical and industrious.   Jesse lived on the place until
summer of 1861, when he married ; then went up the
country ; in the winter he took his wife to Beall place, giv-
ing as a reason that it had the best house on it for his
family.   He resided on Beall place till he went to the war,
and during this time, and while in the war, was frequently
on Wilkins, claiming it as his own, and giving me directions
and orders as to the crops, etc.   When he went to the war
he referred me to his father for directions.   Up to this
time, defendant took no control of the place ; but after-
wards gave me some instructions as to planting the crop of
1862.   I left this place for the war in May, 1862; went to the
same company Jesse belonged to, and Jesse claimed the
Wilkins place up to his death ; that he received a letter
from his father in 1863 notifying him of the purchase of
the Echols place.   Jesse was delighted at it, believing this
purchase made his one of the best places in Southwestern
Georgia.   Knew Jesse was very anxious to purchase Echols
before he went to the war, and heard him speak to his
father of it, who replied that Jesse had better wait until
he made money enough to pay for the place he had.   About
130 to 150 bales cotton made in 1860, and over 300 in
1861; all stored with Sims & Rust's warehouse, in Albany,
in Jesse Beall's name, by me, and as he instructed.   After
I came from the war, I held a note on Jesse ; called upon

defendant to pay it; he declined, saying he could not pay Jesse's debts. Defendant stated he had shaved some of Jesse's debts, and proposed to do so with me, which I declined. Defendant afterwards paid it in full. Was present at the sale of the personal property bought to stock this place in 1859 and 1860; all bid off by Jesse, who consulted with me about it. I aided him in making the selections. Sworn to February 27. 1869.

D. A. Vason's affidavit: Was one of first counsel in this case. The facts stated in the bill in relation to the contract made with Jerry Beall and Jesse were obtained from Y. G. Rust, Jasper Cannon, J. R. Lee and Walker, deceased; all found out before the last marriage of Mrs. Clark. I collected most of it in affidavits, and the testimony of Cannon was same as he previously gave. Deponent believes these facts are true; never saw or heard anything that would cause him to doubt it. These facts were not known, or reported known to Mrs. Clark until after the same, as above stated. Sworn to May 5th, 1883.

G. J. Wright and J. A. Davis' affidavit: The bill in this case was filed in the fall of 1868; Eugenia Beall was a widow, and the facts set forth in said bill were obtained from Jasper Cannon, J. R. Lee, J. M. Walker, Y. G. Rust, H. J. Cook, J. A. McLaren and said Eugenia; and the wills of Moughon and Sanford and inventories and appraisements made by defendant on said estate. The affidavits of Rust, Cook, Walker, Cannon and Lee, here shown to the court, were obtained by D. A. Vason and ourselves, without conversation with C. M. Clark, and said affidavits are substantially as the information given us, on which the bill was filed; and that Cannon's evidence is the same in substance in his affidavit and on the trial; are ignorant of any inducement held out to Cannon or any one else to swear; had no conversation with Clark about the case until after his marriage, December 24th, 1868, and do not remember any then, until the spring afterwards. Sworn to May 19th, 1883.

C. M. Clark's affidavit: Was married to Eugenia Beall December 24, 1868; some few months afterwards he was made a party in this case; Cannon's testimony had been given in before he knew him. A few years after, Cannon moved to Laurens county. I went to get him to attend court here as a witness in this case, preferring to have him on the stand. He came to court. Case not tried. After court I proposed to him, if he would return to the county, that I would give him $1,250 a year as soon as I could get some land for my wife. She was then suing for, and had some prospect of getting the Pace lands, as well as the Wilkins and Echols places. Recollection is I wanted Cannon for the Pace lands; not certain which. He accepted the proposition, and it was reduced to writing and given to him. My object in employing Cannon was, that he was a good manager, fine business habits, skilled farmer, and had managed successfully for Jesse Beall and others; also preferred to have him live in the county, so as to get him to swear from the stand. Most positively denied his purpose was to bribe him as a witness or to affect his evidence, or that he was induced to make this contract as a compensation for his testimony, or that he has ever paid. or promised to pay him anything for his evidence. Sworn to April 11, 1883.

Jasper Cannon's affidavit: Has seen the affidavit of Dozier before set out. The following inaccuracies and misstatements are made therein: 1. He did leave with Dozier sealed package containing contract with Clark; it was 1873 or 1874; that his testimony had been fully given in on February 27, 1869; the contract was not a compensation for his evidence. After he made his affidavit of 1869, he moved to Laurens county. In 1873 Clark came to get him to attend court, which he did; case not tried. Clark was anxious for him to move back; that if I would, he would give $1,250 to oversee the plantations, as he was sanguine that his wife would recover them. I accepted; the same was reduced to writing, and left with Dozier; never have

asked for it since; regret it is not produced, to speak for itself. Did return to this county; been here ever since, and denies that any one has ever given, or promised to give him any consideration for his evidence; denies that he ever told any one Clark was to give him $1,500 per year to oversee if my evidence gained the case, or anything like it. Positively denies that any such agreement was made. The only reason urged by Clark for employing me was, that I was an experienced manager; that I had overseen one of the places before for Jesse successfully, and that he wanted me now, so I could be put on the stand as a witness; $1,200 not extraordinary wages, for up to 1873 I never received less than $1,000 in this section, and on places smaller than these two places. Denies that he was opposed to Dozier showing the contract. Dozier did call on me to state whether the sealed package was not a contract between me and Clark; I said that it was, but it had nothing to do with this case, when he intimated there was something wrong about it. I told him to bring it into court and let it speak for itself; I proposed to meet it and stand by it. Reiterates what he swore to on the stand, and in his former affidavit, and says they are true, and it is strange that his evidence, which has been published and known since 1869, at this late day should be suspected, upon such a flimsy foundation, and his character for truth and veracity thus aspersed. Sworn to April 5, 1883. On the 5th of May, 1883, the following addition is made in a different handwriting: That since giving the above affidavit he has doubts in his mind as to whether it was $1,250 for both places or for each place; it may have been the latter; if so, it is specified in the written contract, which he hopes will be found. These affidavits were put in as complainant's counter-showing on the newly discovered evidence.

2. The first of the grounds of this motion for a new trial which we shall notice, is that numbered 6, together with 35 and 36, which all relate to the incompetency of the juror, Youngblood, who was shown to have been a half-

brother of Jasper Cannon, the principal witness for com-
plainants in the case. Defendant discovered after the trial,
as was shown by affidavits of Dozier, Salter and others,
that Cannon was directly interested in the event of this
suit. That he was under a contract with Clark, the guar-
dian of young Jesse Beall, and the administrator of Jesse
S. Beall, to oversee the Wilkins and Echols places, in case
they were gained by his evidence in the case; that this
contract had been reduced to writing, and signed by the
parties, and had been left by Cannon with Dozier, who
concealed his knowledge of it from the defendant until the
trial was over, when for the first time he made it known
to his counsel. That a writing of this character was left
with Dozier is evident, not only from what Cannon told
him and Salter, but also from the counter-affidavits of Can-
non and Clark. Cannon had given an affidavit, which was
used on the motion to dissolve the injunction. Afterwards
he removed from Dougherty to Laurens county. To in-
duce him to return and testify personally in the case, in-
stead of testifying by interrogatories, and to be certain to
have him present at the trial for that purpose, Clark states
in his affidavit that, at the time of employing him at $1,250
to oversee, and reducing the contract to writing, it was
understood that this agreement should go into effect as
soon as he could get some land for his wife, who was then
suing for and had some prospect of getting the Pace lands,
as well as the Wilkins and Echols places. His recollection
is, that Cannon was wanted for the Pace lands, but is not
certain which; employed Cannon because he was a good
manager; had fine business habits; was a skilled farmer;
had managed successfully for Jesse Beall and others, and
preferred to have him live in the county, so as to get him to
swear from the stand; denies most positively that this
agreement was intended as a bribe, or that he ever paid, or
promised to pay him anything for his evidence. This state-
ment is substantially corroborated by Cannon's affidavit.

Notwithstanding their respective disclaimers, this transac-

tion, to say the least, has a suspicious appearance, and if these facts had been before the jury, they might have materially affected the weight and credibility of Cannon's testimony. It is quite true, that if the only object for which it is now adduced was, by discrediting the witness, to set aside the verdict, and thereby obtain a new trial, it came too late, and would not be available for that purpose.

But it goes further than this. Had the defendant and his counsel been apprised of the facts in time, and had they then known the alleged interest of this witness, they would have hardly permitted his half brother to try the case as one of the jury, and to pass upon their rights. The juror swears that he knew nothing of Cannon's interest in the matter, and the only circumstance that can cast even the least shadow of doubt upon the truthfulness of his denial is the fact of their intimacy and friendship, coupled with their near kinship. The trial by jury cannot be too carefully guarded, to protect it not only from unfairness, but also from any uncertainty on that score. Jurors should be above suspicion. *Omni exceptione majores.* On another hearing, this wrong can be avoided. The defendants will be then left free to assail the witness, if they deem it advisable, and will not be trammeled in their defence by the presence of his kinsman upon the jury. There can be no doubt that he was an improper juror. 28 *Ga.*, 439 ; 47 *Ib.*, 538.

3. Did the evidence in this case make out such a verbal agreement between Jeremiah Beall and his son, Jesse S., touching the Wilkins and Echols places, or either of them, and the crops raised thereon, and the rents and profits issuing out of them, as would justify a court of equity in decreeing a specific performance of the alleged agreement and compelling the defendant to account to the heirs of Jesse S. Beall for the said crops, rents, etc., or in the event that the agreement was established, was it sufficiently shown that there was such a part performance on Jesse's part as entitled the complainants to the decree in their

favor? If the evidence is insufficient, under the rules of law, to establish satisfactorily either one of these propositions, then this verdict was contrary to law, the equity and justice of the case, and was without evidence to support it, and the new trial asked for should not have been refused. There can be no question that the existence of the agreement itself should not have been left in doubt. Hence, the courts have always been averse to acting upon expressions picked out of casual conversations, or extracted from correspondence between the parties themselves, or of the vendor with others, especially where that correspondence is not forthcoming, or from acts of the parties of an equivocal character, which may as well be referred to something other than the alleged agreement, or from the inducements which an anxious parent holds out to a wild and dissipated child, to effect his reformation, and the like.

In the case of *Printup vs. Mitchell*, 17 *Ga.*, 558, 566, Lumpkin, J , in noticing two points in the charge of the judge of the superior court, said: " In commenting upon admissions, he remarked that, when clearly established they were entitled to high consideration. Knowing, as we do, the danger of this species of evidence, we think it best not to relax any of those rules which are designed to guard it against abuse. It is not only necessary that the declarations should be clearly proved, but they should, say the books, be deliberately made and precisely identified." (Citing authorities.)

" Indeed, verbal admissions hastily and inadvertently made, however clearly established, should have little or no binding efficacy;" citing numerous other authorities.

" It is unquestionably true, that while all experience teaches that verbal declarations should be received with great caution, subject as they are to much imperfection and abuse, still, they exert usually a most controlling effect upon the minds of the jury.

"Our learned brother instructed the jury to weigh the evidence and render a verdict accordingly.

"A parol contract for land, like the reformation of a deed by parol proof, should be made out so clearly, strongly and satisfactorily as to leave no reasonable doubt as to the agreement. It is a serious matter to substitute a parol sale of real estate for a deed."

In a case for the specific execution of a contract, the proof must not leave it in doubt whether the contract existed or not. *Everett vs. Towns*, 17 *Ga*, 15.

While it is not indispensable that the agreement should be established wholly by direct and positive evidence of its existence, and while it may be inferred from acts and conduct clearly referable to it, yet such acts must be of an unequivocal and unambiguous character, and must be established by testimony clear, definite and unambiguous in its terms; they must be such as necessarily result from the agreement, and as the party would not have done, unless on account of that very agreement, and with a direct view to its performance, and the agreement so set up must appear to be the same as the one alleged to be partly performed. Lester *vs.* Foxcroft, 1 White & Tudor's Lead. Cas. Equity, 507, English and American notes, *passim;* Shepherd *vs.* Shepherd *et al.*, 1 Md. Ch. R., 244, 248 and citations; Code, §3187 and citations, especially *Russell, adm'r, vs. Switzer*, 63 *Ga.*, 723, 725, where the cases are collated and reviewed by Bleckley, J.

That the same fullness and certainty of proof as to the terms of the agreement is requisite, was held and adjudged by this court in the well considered case of *Miller vs. Cotten et al.*, 5 *Ga.*, 341. The able and exhaustive opinion of Judge Lumpkin in that case has been since followed, and from it and its successors on the same line the provisions of our Code, both as to the force and effect of admissions (§3792), and the circumstances under which a parol agreement for the sale of lands will be specifically executed, already cited, have been drawn; in fact these sections

embody principles, long previously established by the com-
mon law courts, and are merely declaratory of these prin-
ciples. These are the rules controlling in cases of agree-
ments founded upon a valuable consideration. If the
present had been that case, it would have fallen far short
of the requirements of the law, as to the amount and
character of proof necessary to sustain the allegations in
complainants' bill; but it is a much more questionable
case than one founded on such a consideration.

This was a mere voluntary promise made by a father
to his minor son; the lands, hands and stock all belonged
to the father; the son contributed nothing that did not be-
long to the father, and which he had not a perfect right to
control. It is too plain to require argument, that the
specific performance of a voluntary agreement, or merely
gratuitous promise, will not be decreed; there must at least
have been possession of the lands given under the agree-
ment, upon a meritorious consideration, accompanied with
valuable improvements made upon the faith thereof, be-
fore a court of equity would be authorized to intervene in
behalf of such a party. Code, §3189. Dorsey *vs.* Park-
wood, 12 Howard R., 126, was a much stronger case than
this for a specific performance; in that case, the bargainer
had no right to the services of the bargainee; in this he
had, yet the Supreme Court of the United States held,
without dissent upon the part of any of its members, that
" an agreement whereby the purchaser of a plantation
bound himself" by writing, as appears from the record,
" to transfer to his son-in-law one-half of the plantation,
slaves, cattle and stock, as soon as the son-in-law should
pay for one-half of the cost of said property, either with
his own private means or with one-half of the profits of
the plantation, was deficient in mutuality. The son-in-
law was not bound to render any services nor pay any
money. It was a *nude pact*. It was not an alternative
obligation upon the son-in-law, because the election to pay

his half out of the profits would have been merely paying with another man's money."

From the evidence on the trial, it is apparent that the parties never contemplated that Jesse S. Beall should pay for these plantations, otherwise than by the profits thereof, and these profits were certainly the right and property of his father, made upon his land and by the labor of his stock and hands. It does not appear that any of Jesse's hands worked these lands when the crops in controversy were made; true, a portion of the time, his wife's hands were on the place, but then it is satisfactorily shown that they were hired, and their hire paid to the wife by the father. The jury have found by their verdict that none of the trust estate held by the father for Jesse has gone or should have gone to the performance of Jesse's part of this agreement, and this finding accords with the evidence had on the trial. Jesse's representative seems to have taken this view of the matter, for he now has a proceeding pending in Baldwin superior court against the father to compel him to account for these trusts. Whether this proceeding was instituted before he was made a party to this bill does not satisfactorily appear. Although a defendant to the bill, he seems to have been willing to occupy this position in relation to the litigation; he certainly did not object, nor is it material to inquire why he did not; it is enough to know that his interests were antagonistic to those of the principal defendant, and were consonant with the claims preferred by the other complainants. The points made and urged by the complainants are not aided by the decisions of this court in the case of *Mims vs. Lockett*, 33 *Ga.*, 9, or the case of *Porter vs. Allen*, 54 *Ga.*, 523. The agreement in the former case was founded upon a valuable consideration. It was made in consequence of a contemplated marriage, which afterwards took place; and that marriage is such a consideration is familiar doctrine, and taking place after the agreement, it will be presumed to have been an inducement to the marriage.

Verplank *vs.* Sterry, 12 Johns. (N. Y.) R., 536; Atherly on Marriage Settlement. The marriage being consummated, the son-in-law, with the consent of his wife's father, in pursuance of the agreement, went into possession of the land, and made valuable improvements thereon. The other case is an exposition of section 3189 of the Code, and decides, among other things, that the conditions specified under that section must exist, to entitle a party to call upon a court of equity to enforce the performance of a voluntary agreement, and therefore the test of the right is whether these conditions are established, and not whether there has been such a part performance as would render it a fraud in the donor not to execute the agreement.

What are the acts of. part performance relied upon in this case? That Jesse Beall lived on the place when it suited his convenience or inclination so to do; that he was married against his father's consent; that subsequently thereto he moved on another place belonging to his father; that his wife had on one of these places some poultry that she looked after; that he selected a site for building a residence on one of them, but never built; that he paid overseers, presumably, from the income of the places, for he at that time commanded no other means—his father having his debts to pay, and defraying out of his own means the expenses incurred in running the plantations, besides supporting him and his family; that the cotton was marked and stored in his name, etc.; but after it was stored, he took no further interest in it, and gave no directions respecting it.

Jesse Beall never considered that he had any right to these places, or either of them. He never communicated any such claim to his wife; and after his death, she, with her mother and the other complainant, purchased both places, and sold them to Woodward. Never was this claim set up until these parties were called upon by suit to respond for the purchase money. Add to this the fact that Jesse Beall himself, on repeated occasions, both be-

fore and after his marriage, disclaimed title to his property, and never, so far as it appears from any direct testimony, set up anything more than a promise from his father that he would, at some future time, and upon certain contingencies, make him title, as appears from the testimony of Oliver, Walker, Outz, Dozier, and Joseph Beall, and perhaps others; that the father never abandoned, but exercised over these plantations the same control that he had always done over them and his other property, and that the alleged gift was so unreasonable and profuse that it embraced much the larger portion of his estate, and divested him of power to make provision for other children who stood as favorably in his affections and feelings as did Jesse; and we think the showing made to defeat this attempt was invincible. The statute guards the danger of abuse from these alleged parol gifts very scrupulously and carefully, by enacting that, the "exclusive possession by a child of lands belonging originally to the father, without payment of rent for the space of seven years, shall create conclusive presumption of a gift, and convey title to the child, unless there is evidence of a loan, or of a claim of dominion by a father, acknowledged by a child, or of a disclaimer of title on the part of the child." Code, §2264; 42 *Ga.*, 121; 48 *Ib.*, 332. That a parol gift cannot be inferred from possession for the requisite period, under this section of the Code, see 59 *Ga.*, 139.

These principles, which we think are applicable, dispose of the principal questions raised by this record, and will correct where correction is required, all charges given, refused or qualified, of which the defendant has complained. This view renders it unnecessary to consider the several exceptions made to the rejection and admission of testimony.

4. This verdict must be set aside, so far as it decrees to the heirs at law of Jesse S. Beall, the Wilkins and Echols plantations, and the income and rents accruing therefrom. The evidence on which this part of it rests is wholly want-

ing; it is not sustained by law, and fails to make out the claim as set forth in the complainant's bill. The verdict carefully excluded all account of the trusts in defendant's hands growing out of the Sanford and Moughon estates, in favor of Jesse Beall, and the specific performance of the agreement in reference to the land in controversy being disallowed, there is nothing remaining in the suit with which to connect these trusts, so as to make them the proper subjects of consideration. The sole remaining question, therefore, is the notes upon which the defendant brought his common law suit against Mrs. McLaren, Mrs. Clark and Bryan. The court and jury, from the evidence and facts on that issue, separated from all other claims, must determine what, if anything, is due the estate of the defendant, Jeremiah Beall, from the aforesaid complainants, growing out of the original sale of the lands by Beall to them, and the subsequent sale to Woodward, and Beall's dealings in reference thereto, with him or his estate.

Judgment reversed.